NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0781n.06
Nos. 12-5305/5726/5741

**FILED**
Oct 15, 2014
DEBORAH S. HUNT, Clerk

**UNITED STATES COURTS OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| ADRIAN DEWAYNE PATTERSON and HERMAN | ) | COURT FOR THE MIDDLE |
| MAJORS, JR., | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendants-Appellants. | ) | |
| | ) | |

BEFORE:    COLE, Chief Judge; ROGERS and ALARCÓN[*], Circuit Judges

ROGERS, Circuit Judge.

Adrian Patterson and Herman Majors, Jr. were tried and convicted of conspiracy to possess with the intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The evidence at trial showed that Patterson and Majors participated in a drug trafficking ring that extended from Tennessee to California. The two men now separately appeal from their convictions, raising eight distinct challenges. One is that the district court should not have removed a deliberating juror after learning that the juror had failed during voir dire to reveal information regarding her experiences with drugs. The court's actions did not constitute reversible error, because there was clear evidence of the juror's misconduct and no reasonable indication from the record that the request for discharge stemmed from the juror's view of the sufficiency of the evidence. Patterson and Majors' other grounds for appeal are also without merit—

---

[*] The Honorable Arthur L. Alarcón, Senior Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

including challenges regarding the admissibility and sufficiency of the evidence, double jeopardy, ex parte communications with the jury, and substantive and procedural aspects of the sentences.

**I.**

Between 2004 and 2006, defendants Patterson and Majors participated in a drug trafficking conspiracy involving the possession and distribution of more than 150 kilograms of cocaine. Patterson purchased cocaine from dealers in Los Angeles, and arranged for it to be transported to Tennessee. Majors and other individuals traveled to and from Los Angeles with cash and drugs hidden in vehicles.

The conspiracy came to light over a period of years. In late 2004, while driving to Los Angeles, Majors and Cleo Patterson (a relative of Adrian Patterson's) were stopped for a traffic violation, and a search revealed 26 kilograms of cocaine in a hidden compartment of the vehicle. Both men were arrested. In 2006, agents of the Drug Enforcement Administration in Los Angeles and Nashville began collaborating on an investigation of a multi-kilogram cocaine transaction that was to take place in Tennessee. The Los Angeles agents had learned from a wiretap that a cocaine supplier would be traveling from Los Angeles to meet a buyer in Clarksville, Tennessee. The Nashville agents identified Adrian Patterson as buyer. With the participation of officers from the Clarksville Police Department, the agents established surveillance of the expected meeting site, which was located at 2211 Ladd Drive.

Soon thereafter, Tim Anderson of the Clarksville Police Department sought and obtained a warrant to search for evidence of drug trafficking at Ladd Drive. The warrant was executed the same day, and Adrian Patterson was among those present during the search. Officers seized over $300,000 in cash, along with approximately one kilogram of cocaine. Also seized was a Ford F-150 that had been used to transport Herman Majors and Cleo Patterson from Los Angeles to Tennessee in 2004.

Two months later, agents executed a search warrant in Clarksville at Patterson's alleged residence, 1869 West Court. Patterson was the only person in the home when the warrant was executed. Among the items seized was a Ford Expedition used to transport drug proceeds.

In 2009, the federal government charged Patterson and Majors with conspiracy. The government subsequently filed a five-count superseding indictment that included the conspiracy count (Count 1),

2

along with four additional charges against Patterson for other crimes (Counts 2-5). To avoid prejudice at trial, the district court severed Count 1 from Counts 2-5.

Before trial for the conspiracy count, Patterson moved to suppress the fruits of the Ladd Drive search. After a hearing on the matter, the district court denied the motion, concluding that the officers had relied in good faith on the warrant. Subsequently, Patterson moved to prevent the government from introducing evidence from the search at West Court, contending that the evidence related to severed Counts 2-5. The court denied that motion too.

At voir dire, the attorneys asked the prospective jurors a series of questions about drugs, drug trafficking, and cooperator testimony. One of the prospective jurors indicated that she knew one of the plainclothed U.S. Marshals in the courtroom as an acquaintance of her husband. In response, the district court judge explained that the jurors would not be asked to evaluate the credibility or the memory of the marshal, whose "main function is to see that the judge doesn't get hurt." The next morning, after some jurors expressed concerns about security, the judge and several court employees met with the jury to discuss safety. The parties and their attorneys were absent, but the meeting was on the record. After the judge notified the parties and their attorneys of the colloquy, Patterson moved for a mistrial. The judge denied the motion and overruled a motion to renew it.

In their proposed instructions to the jury, both Majors and Patterson asked the court to incorporate a statement that a defendant's "mere presence" could not support a finding of guilt on the conspiracy charge. The district court denied the request, but ultimately instructed the jury that "proof that a Defendant simply knew about a conspiracy, or was present at times . . . is not enough, even if he approved of what was happening or did not object to it."

Following a two-week trial, the jury began deliberations. After a few hours, the foreman informed the judge that the group was unable to reach a unanimous decision on either defendant. The court issued a modified *Allen* charge, and sent the jury home for the day. The following morning, the foreman sent a note to the court asking if the judge would consider dismissing one juror, Juror LeClair, who had reportedly stated that she had information about drugs that she had not revealed during voir dire.

3

In response, the court conducted a series of interviews with relevant jurors regarding the allegations, cautioning each interviewee to avoid revealing any views of the case. After completing these interviews, the court removed Juror LeClair and replaced her with an alternate.

The jury found Patterson and Majors guilty of conspiracy. Patterson was subject to and received a mandatory minimum sentence of life imprisonment. Majors faced a guidelines range of 360 months to life imprisonment. The court sentenced him to 360 months' imprisonment, and recommended that he be placed in a facility capable of addressing health concerns he had raised. PageID #3706 (sealed).

Patterson and Majors then appealed, raising eight distinct challenges: (1) that the district court improperly denied the motion to suppress the fruits of a search at Ladd Drive (Patterson); (2) that the district court abused its discretion by declining to declare a mistrial following *ex parte* communications with the jury (Patterson and Majors); (3) that the district court abused its discretion in admitting evidence from the West Court search to prove Count I, such that the other counts from the superseding indictment were barred by double jeopardy[1] (Patterson); (4) that the district court abused its discretion in denying Majors' request for a "mere presence" jury instruction (Majors); (5) that the district court abused its discretion in replacing a juror after deliberations began (Patterson and Majors); (6) that the evidence adduced at trial was not sufficient to support a guilty verdict (Majors); (7) that Majors' sentence of 360 months' imprisonment was procedurally and substantively unreasonable (Majors); and (8) that the statutory recidivism enhancement increasing Patterson's sentence to a mandatory minimum of life imprisonment violated the Sixth Amendment (Patterson).

**II.**

**A.  Motion to Suppress the Fruits of the Search at 2211 Ladd Drive (Patterson)**

The district court properly denied Patterson's motion to suppress the fruits of the search at Ladd Drive because the search was valid under the good-faith exception recognized in *United States v. Leon*,

---

[1] After the district court denied Patterson's motion to dismiss severed Counts 2-5 on double jeopardy and collateral estoppel grounds, he filed an interlocutory appeal from that denial, No. 12-574, which has been consolidated with the other appeals for briefing and argument.

468 U.S. 897, 913 (1984).  *Leon* provides that, subject to limited exceptions, evidence will not be

excluded if it was obtained by an officer acting in objectively reasonable reliance on a search warrant,

even if the warrant is subsequently invalidated.  *Id.*

In support of his request for a warrant to search the Ladd Drive property, Tim Anderson of the

Clarksville Police Department presented the following facts in an affidavit to a Tennessee court:

> In November, 2005, the Clarksville Police Department Major Crimes Unit received information from an anonymous source that they suspected that Anthony JOHNSON, John WHITSETT, Rick REDA and AJ MYERS were involved in drug related activity at 2211 Ladd Drive. JOHNSON and MYERS reside at the residence. The anonymous source described a pattern of traffic at the residence in which vehicles arrived, pulled behind the residence and stayed a brief time before leaving. This source went on to say that Anthony JOHNSON had gotten out of jail for murder.

> According to records from the Clarksville Department of Electricity, as of December 1, 2006, Anthony JOHNSON is listed on the account for 2211 Ladd Drive, JOHNSON has had this account since August 2005.

> An N.C.I.C. check of JOHNSON indicates that he was arrested for the following:
> 5-18-1991 First Degree Murder.
> 1-22-1993 Possession of crack cocaine for resale.
> 2-8-2000 Possession of marijuana for resale.

> On December 1st, 2006 the Affiant spoke to SA Charles Cravalt [sic] of the Drug Enforcement Agency, SA Cravalt advised the Affiant that he had received reliable information that within the past 48 hours, cocaine was being kept at 2211 Ladd Drive, Clarksville Tennessee.

> On November 30, 2006 surveillance was established on the residence at 2211 Ladd Drive, several vehicles were observed arriving at the residence and staying a brief period of time before leaving.

Agent Anderson later testified that he supplemented the affidavit orally by informing the Tennessee court

that a federal wiretap was the source of the information provided by Special Agent Gravat (called

"Cravalt" in the affidavit).  The district court credited this testimony.

It was not error for the district court to conclude that Agent Anderson relied in good faith on the

warrant.  Even though Anderson's corroboration of the anonymous tip about drug activity at 2211 Ladd

Drive "was, admittedly, minimal, it did not represent [a] complete lack of corroboration or independent

evidence."  Agent Anderson observed "unusual traffic patterns, characteristic of drug trafficking activity,

with very short visits by a number of different cars."   Moreover, Agent Anderson supplemented the affidavit with oral information about the federal wiretap.  Finally, as the district court stated:

> Agent Anderson . . . testified at the hearing that he believed that "once [the Tennessee judge] authorized [him] to execute a search against the private residence [i.e., 2211 Ladd Drive]," he "believed it was a good authorization" because [the judge] "had reviewed it and he had determined that there was probable cause" and because previous experiences with [the judge] indicated to Agent Anderson that if [the judge] felt it wasn't probable cause, "he would have told [Agent Anderson]" so and "sent [him] back" for more evidence to put in the Affidavit.  Tr. at 64.

Patterson has not shown that the warrant contained a knowing or reckless falsehood, such that *Leon* would not apply.  His argument against applying *Leon* rests on a discrepancy between Anderson's affidavit in support of the warrant and Anderson's follow-up report to the search.  The affidavit states that the DEA special agent told Agent Anderson that he "had received reliable information that within the past 48 hours, cocaine *was being kept* at 2211 Ladd Drive."  In the follow-up report, Anderson states that, as of November 30, "[t]he Nashville DEA had received information from authorities in California that subjects at this residence *were going to receive* a quantity of cocaine.  The subject bringing the cocaine was believed to be driving a blue Chevy Monte Carlo."

Following a hearing on the issue, the district court addressed the discrepancies between the two statements and concluded that, in light of credible testimony by Agent Anderson, Patterson had not shown by a preponderance of the evidence that Anderson had knowingly or recklessly misled the court about the timing of the cocaine's arrival at 2211 Ladd Drive.  At the hearing, Agent Anderson stated that: "On November 30th the information was that they were going to receive cocaine. On December 1st was when I received information that the cocaine was being kept at the house."  After hearing this testimony, the court acknowledged that the discrepancy was "perhaps suspect," but concluded that it was "entirely possible . . . Agent Anderson was apprised of the updated information by the DEA as to the present (or immediately past) whereabouts of the cocaine at some point on December 1, 2006, prior to the issuance of the warrant at 8:00 p.m., but after the November 30th information he received (regarding the imminent delivery of that cocaine) and which was referenced in his follow-up report."  Particularly in light of the

district court's decision to credit Agent Anderson's testimony, Patterson has not shown that the purported discrepancy constituted a reckless or knowing falsehood, and that *Leon* therefore should not apply.

The record does not show that, as Patterson claims, the issuing judge was a "rubber stamp" for Agent Anderson. The "rubber stamp" limitation does not apply where a movant offers no evidence to suggest that a judge has failed to exercise his discretion, *United States v. Leake*, 998 F.2d 1359, 1366 (6th Cir. 1993). Patterson has not offered adequate support for his assertion that the issuing judge did not conduct an objective evaluation of the request for a warrant. As the district court noted, the issuing judge had, in the past, asked for additional information about the identity and reliability of confidential informants, and had declined to grant warrants when he believed the supporting affidavits did not establish probable cause. In addition, Agent Anderson supplemented his written affidavit with sworn testimony about the source of his knowledge regarding the presence of cocaine at 2211 Ladd Drive. *Id.* Because the issuing judge had a practice of requesting supplemental information or denying warrants altogether where probable cause was lacking, and because Agent Anderson supplemented his request for a warrant with sworn testimony, it was not error for the district court to conclude that the issuing judge did not act as a rubber stamp.

**B.  Motion for mistrial following *ex parte* communications (Patterson and Majors)**

The district court did not commit reversible error under the Constitution or under Federal Rule of Criminal Procedure 43 in denying Patterson's and Majors' motions for a mistrial following an *ex parte* jury communication about security. A defendant has a due process right to be present at a proceeding "whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge . . . [T]he presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (per curiam) (internal quotation marks omitted). With exceptions not implicated here, Rule 43 states that a defendant must be present at every stage of trial.

The ex parte communication occurred as follows. A prospective juror stated during voir dire that she knew one of the marshals as an acquaintance of her husband. The district judge then explained that

7

the prospective juror would not be asked to evaluate the memory or credibility of the marshal, whose "main function is to see that the judge doesn't get hurt." Some jurors then "expressed a little bit of concern about security." During the ensuing *ex parte* discussion, the court took steps to allay the jurors' concerns, stating that:

> [B]ased on my history, 30 years' history, if there is anger on the part of Defendants, whether they are angry because they feel they are not guilty and they are being wrongfully prosecuted or because they're angry because they are guilty and are being prosecuted, that anger is not directed toward the Jurors. It is directed to toward the prosecutor and sometimes the judge."

The court specifically reminded the jurors to presume the defendants' innocence:

> I must say, of course, these Defendants are presumed to be not guilty of the charges against them. And you are to withhold judgment until you have heard all of the evidence in the case, the evidence presented by the prosecution and the evidence presented by the Defendants and the argument of the lawyers after all the evidence is in and the charge that I give you after all of the evidence is in.

The *ex parte* conversation occurred on the record, and the court provided transcripts to the defendants and their counsel. After the meeting, the judge informed counsel that he had met with the jury, and stated that the jurors had left the meeting "smiling and reassured."

These facts do not amount to a constitutional violation. The court met with the jurors only to allay their safety concerns, which were linked to a reasonable communication about the deployment of security in the courtroom. Because the meeting addressed merely "a little bit of concern about security," the presence of the defendants and their counsel might have been counterproductive, escalating the meeting and providing an even more explicit link between the defendants and the safety concerns. The conversation occurred on the record, and the court provided transcripts to the defendants and their counsel. In the context of a two-week conspiracy trial, the colloquy was a minor one, and the jurors left the meeting "smiling and reassured." In light of these facts, the informal *ex parte* meeting to reassure the jurors of their safety and to remind them that "these Defendants are presumed to be not guilty of the charges against them" did not violate Patterson's and Majors' constitutional rights

This conclusion is directly supported by *Gagnon*, which involved an *ex parte* communication about juror safety during a complex trial involving allegations of a large-scale cocaine distribution

conspiracy. 470 U.S. at 523. After a juror observed one of the four defendants sketching portraits of the jury, the judge announced in open court that he would meet with the individual juror to determine whether the sketching had prejudiced him against the defendant. *Id.* The judge convened three persons for the on-record meeting: the juror, a bailiff, and counsel for the defendant in question. *Id.* at 523–24. Following statements by the judge that the defendant was an artist who had meant no harm by his sketching and would halt the offensive activity, and that the existing sketches had been confiscated, the juror indicated that he was willing to continue as an impartial juror. *Id.* at 524.

All four defendants were convicted, but the Ninth Circuit reversed, holding that the *ex parte* meeting had violated the due process and Rule 43 rights of the defendants. *United States v. Gagnon*, 721 F.2d 672 (9th Cir. 1983). The Supreme Court reversed, reasoning that the Constitution did not require the presence of the defendants and their counsel. *United States v. Gagnon*, 470 U.S. 522, 527 (1985). "Respondents could have done nothing had they been at the conference, nor would they have gained anything by attending." *Id.* Indeed, the court suggested that the presence of the four defendants, their counsel, and the prosecutor could have been counterproductive. *Id.* Moreover, the colloquy had been a minor occurrence, particularly in the context of a complex trial, and the defendants had waived any objections under Rule 43 through their failure to object or attempt to attend the conference. *Id.*

This case offers even fewer grounds for reversal than *Gagnon*. The court met with the jurors only to allay "a little bit of concern about security," which was linked to a communication about the deployment of marshals in the courtroom, and not to improper conduct by a defendant. The event was a relatively minor occurrence in the context of a two-week trial, and the presence of Patterson and Majors might have been counterproductive, increasing the apparent significance of the meeting and creating a stronger link between the defendants and the jurors' concerns. Moreover, the judge specifically reminded the jurors to presume the defendants' innocence, and took steps to allay any security concerns. The jurors left the colloquy "smiling and reassured."

The defendants rely on *United States v. Smith*, 31 F.3d 469, 472 (7th Cir. 1994) to assert that the jurors' security concerns "might reasonably indicate that the jurors had already concluded . . . that [the

defendant] was guilty and posed a potential danger to them," and that the defendant therefore had a right to be present at the judge's *ex parte* communication regarding safety.  But *Smith* involved materially different facts.  The subject of the communication in that case was "serious": the distribution of an outline sheet identifying the jurors' names and places of residence.  *Smith*, 31 F.3d at 470.  Here, by contrast, the communication addressed a less extraordinary subject: concerns about the presence of a marshal in the courtroom.  Even "the conspicuous deployment of security personnel in the courtroom during trial is not . . . [an] inherent[ly] prejudicial practice."  *United States v. Elder*, 90 F.3d 1110, 1131 (6th Cir. 1996) (citing *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986)).  The court did not commit reversible error under the Constitution by engaging in the ex parte communication.

Excluding the defendants from the colloquy also did not constitute reversible error under Rule 43. Subject to exceptions not implicated here, Rule 43 provides that a defendant "must be present at . . . every trial stage."  Violations of the rule are subject to a harmless error analysis.  *United States v. Harris*, 9 F.3d 493, 499 (6th Cir. 1993).  The applicable standard is whether there is any reasonable possibility of prejudice.  *Id.*  Here the *ex parte* communication created no reasonable possibility of prejudice.  Unlike in *Smith*, where the appellate court was unable to deem any error harmless because the *ex parte* communication was off the record ("neither the judge's communications with the jury nor his private jury instructions [were] available for review, *Smith*, 31 F.3d at 473), here the judge recorded the conversation and distributed transcripts to the parties and their counsel.  The record shows that the judge specifically reminded the jurors to presume the defendants' innocence, and was taking steps to allay "a little bit of concern about security" linked to the presence of marshals in the courtroom.  The record also reflects that the jurors left the meeting "smiling and reassured."  For the reasons articulated above, it might have been counterproductive to invite the defendants to participate in the discussion.  In light of these facts, any error was harmless.

## C.  Admission of evidence related to Counts 2–5 of the superseding indictment (Patterson)

Double jeopardy does not bar Patterson's prosecution on severed Counts 2–5, and the district court did not abuse its discretion in permitting the government to introduce evidence related to the search

at 1869 West Court. Patterson asserts that the introduction at the conspiracy trial of evidence from the West Court investigation means that severed Counts 2-5 are barred on double jeopardy grounds because the government cannot try Patterson "on proof already used to convict him in violation of his Fifth Amendment right against being twice placed in jeopardy for the same offense." Patterson also argues that permitting the government to introduce evidence related to the search at 1869 West Court unfairly prejudiced the conspiracy trial.

These arguments are fundamentally flawed. The Double Jeopardy Clause "protects against a second prosecution for the same offense after conviction or acquittal, and against multiple punishments for the same offense." *United States v. Turner*, 324 F.3d 456, 461 (6th Cir. 2003) (internal citation omitted). The related concept of collateral estoppel dictates that "when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe v. Swenson*, 397 U.S. 436, 443 (1970).

The mere fact that some evidence introduced at Patterson's trial on Count 1 might also be used to prosecute him in a separate proceeding on different counts does not mean that the subsequent action is barred by the Double Jeopardy Clause or the collateral estoppel doctrine. Counts 2–5 of the superseding indictment charged Patterson with crimes entirely separate from the conspiracy charge in Count 1. Whether Patterson intended to enter into an agreement to distribute cocaine does not prejudice the analysis of whether Patterson is guilty of maintaining a residence for the purpose of unlawfully manufacturing controlled substances (Count 2); whether he knowingly possessed with intent to distribute a certain quantity of cocaine, crack, and marijuana found at the residence (Count 3); whether he knowingly possessed a semiautomatic weapon and maintained a residence to unlawfully manufacture controlled substances (Count 4), and whether he was a felon in possession of a firearm (Count 5). As the district court reasoned in denying Patterson's motion to dismiss Counts 2–5:

> Defendant's connection to the West Court house was not an issue of fact determined by the jury's verdict. The jury "could have grounded its verdict upon an issue other than" the evidence Defendant disputes. Defendant could have, and in many cases did, object to the relevance of the evidence at trial. To the extent that Defendant did make such objections, the Court determined that the evidence was relevant to the charges of Count

> One. The Court will not now dismiss the additional counts because the evidence is also relevant to other alleged crimes. The Supreme Court has rejected a "same evidence" test for double jeopardy challenges, stating that "the introduction of relevant evidence of particular misconduct in a case is not the same thing as prosecution for that conduct." *United States v. Felix*, 503 U.S. 378, 387 (1992) (holding that the Government was not foreclosed from prosecuting substantive drug offenses although it had presented evidence of the drug transactions as evidence of another crime).

The law is clear: the government is not precluded from separately prosecuting Patterson on Counts 2–5.

Introducing evidence related to the residence at 1869 West Court also did not lead to unfair prejudice in the conspiracy trial. Patterson argues that the evidence introduced against him was used to "establish that 1869 West Court was a hub of drug trafficking activity, eliciting testimony and offering exhibits regarding law enforcement 'trash pulls' that yielded latex gloves and plastic baggies used in drug trafficking." But as the Government explained during the district court hearing on Patterson's motion in limine, the prosecution needed to introduce evidence related to the West Court home in order to refute Patterson's claim that he merely stayed at the residence from time to time and had minimal connection to the Ford Expedition vehicle used in the Count 1 conspiracy and found at the West Court address. Recognizing that Counts 2–5 were severed in large part because of concerns that Patterson would be prejudiced by charges related to weapon possession and criminal history (i.e., felon-in-possession charges), the government limited the evidence introduced from West Court. The "packaging for various drugs, marijuana stems, little rocks of crack," and "latex gloves" found in various trash pulls at the West Court residence were introduced to rebut Patterson's attempt to distance himself from the residence by arguing that his fingerprints were not found on any of the evidence at the house. The discovery of latex gloves, along with wrappings and other indicia of drug trafficking, helped to show a plan and preparation to avoid detection. Accordingly, the evidence was highly relevant to the charge of conspiracy, and that relevance was not outweighed by the risk of unfair prejudice, particularly in light of the limited scope of the evidence that was admitted. The court did not err in admitting the evidence, and prosecution is not barred for Counts 2 –5.

**D. Denial of a "mere presence" jury instruction (Majors)**

The district court did not abuse its discretion in declining to provide the jury with a "mere presence" instruction. "An abuse of discretion [for failure to give a requested instruction] may be found if (1) the proposed instruction is substantially correct; (2) the proposed instruction is not substantially covered by other delivered charges; and (3) the failure to give the instruction impaired the defendant's theory of the case." *United States v. Henderson*, 626 F.3d 326, 342 (6th Cir. 2010) (internal quotation marks omitted). Majors' proposed instruction was not a substantially correct statement of the law, portions of it were covered by other delivered charges, and, particularly in light of those two considerations, the failure to give the instruction did not impair Majors' theory of the case. The proposed instruction read:

> The mere presence of the defendant [         ] at the scene of commission of a crime is not. [sic] standing alone sufficient evidence for direct or circumstantial proof of guilt or involvement of the defendant [         ] in the commission of the crime. Such evidence cannot support a finding of criminal guilt.
> Source: *United States v. Spiva*, 1996 U.S. App. LEXIS 24014.

While the first statement of the proposed instruction is correct—mere presence alone is not enough to prove a defendant's guilt—the following sentence is misleading. "Although mere presence alone is insufficient to support a guilty verdict, presence is a material and probative factor which the jury may consider in reaching its decision." *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986) (quoting *United States v. Kincade*, 714 F.2d 1064, 1065 (11th Cir. 1983)). Furthermore, the district court's final instructions include a warning whose substance overlaps with the proposed statement: that "proof that a Defendant simply knew about a conspiracy, or was present at times, or associated with members of the group, is not enough, even if he approved of what was happening or did not object to it." Finally, particularly in light of the misleading nature of the second sentence of the proposed instruction, along with the substantial overlap between the proposed and final instructions, the failure to provide the jury with Majors' proposed charge did not impair Majors' theory of the case. He was still able to assert that he maintained only innocent associations with Patterson and the other members of the conspiracy,

and the jury was specifically instructed that it must acquit Majors unless the jurors determined that he "voluntarily joined [the conspiracy] intending to help advance or achieve its goals." The district court did not abuse its discretion in declining to adopt Majors' proposed instruction.

**E. Replacement of Juror LeClair after the start of deliberations (Patterson and Majors)**

Although the issue gives us pause, the district court did not abuse its discretion in removing Juror LeClair and replacing her with an alternate. A court may replace a juror for cause. *United States v. Warren*, 973 F.2d 1304, 1308–09 (6th Cir. 1992) (quoting *United States v. Ellenbogen*, 365 F.2d 982, 989 (2d Cir. 1966); *United States v. Ramos*, 861 F.2d 461, 466 (6th Cir. 1988). There was cause to remove Juror LeClair because she was not candid during voir dire regarding her own experiences with drugs.

During voir dire, Juror LeClair said nothing in response to the following: (1) questions about whether any jurors were "having an on-going issue relating to drugs, whether themselves or close friends, relatives, members of their church they're very close to, anything like that"; (2) inquiries as to whether any juror "had their life touched by drugs or drug abuse or addiction or anything like that?"; (3) the statement that, "if there's something that strikes too close to home about drugs, then that's something that we would need to know about"; and (4) the admonition that if a juror subsequently remembered information the juror believed he or she should disclose to the court, then "that's something you'd probably remember that we really need to know about."

Statements by members of the jury, including statements by Juror LeClair herself indicated that LeClair's responses during voir dire were not candid. The jury foreperson stated that another juror had overheard Ivy LeClair commenting on information, "[n]ot on this trial, but information on what this trial deals with, that the Juror had reported it to me indicated that it was prejudicing [LeClair] against this trial, and that the Juror that reported it to me said she did not reveal this during Jury selection." A second juror said that LeClair "mentioned that she knew some people like that, what we were—as far as what—kind of like what's involved in this type of case. That's all she said." A third juror stated that LeClair "mentioned that she knew people that did drugs and knew people that trafficked drugs." When the judge

14

asked whether LeClair had indicated "how she was thinking as a result of knowing that," the third juror replied,

> She mentioned at two different times that she knew people that used drugs and dealt drugs and that she'd seen it—one time she mentioned that she'd seen it being dealt, and another time she mentioned that she never actually saw the people dealing drugs. I don't think she ever in the same conversation tied together that that is how she was influenced. . . . I think there are other factors that – and I don't know if I can say something without you directly asking me.

For her part, Juror LeClair stated that she had "never seen anybody doing drugs, but I knew that they were drug users but I never saw them do drugs in my presence. But I overheard other people tell me that they were drug users." The Government claimed that it would have exercised a peremptory strike against LeClair had she revealed this information during voir dire. The remarks of the members of the jury, including the remarks of Juror LeClair, provide evidence of LeClair's misconduct and offer no reasonable indication that the request for her discharge stemmed from her view of the merits.

There is no basis in the record from which to conclude that the district court removed Juror LeClair because of her views of the case. After reports surfaced regarding LeClair's lack of candor during voir dire, the district court interviewed individual jurors about the matter, but specifically advised each not to reveal which way Juror LeClair (or the jury as a whole) was leaning. Indeed, Patterson acknowledges that a juror's "comments . . . [do] not directly convey[] Ms. LeClair's disposition." Nonetheless, the defendants speculate that the record provides for more than a reasonable possibility that Juror LeClair was a holdout for acquittal and that the request for her dismissal stemmed from her view of the evidence. In support of this assertion, the defendants point to the fact that the jurors waited to reveal adverse information about Juror LeClair until the jury could not reach a unanimous verdict, instead of "com[ing] forth with their allegations regarding Ms. LeClair immediately after overhearing her comments." However, no concrete facts support the allegation that the district court was aware of LeClair's view of the case, or removed her because of it. Nor do any concrete facts support the allegation that the jurors requested that LeClair be removed because of her views of the case. The court did not abuse its discretion in removing Juror LeClair.

This determination is consistent with caselaw addressing the removal of a juror after the start of deliberations. Courts reversing a decision to discharge a deliberating juror have done so when there was more compelling evidence than there is here that the discharge stemmed from the juror's view of the case. For example, in *United States v. Brown*, the D.C. Circuit reversed a decision to remove a deliberating juror who had stated that he wished to be dismissed because he "disagree[d] with" an underlying statute and was concerned about the manner in which evidence had been presented during trial. 823 F.2d 591, 594 (D.C. Cir. 1987). In contrast, Juror LeClair never openly expressed her opinion of the underlying law or the evidence presented at trial, and she and her peers did not even suggest that they were seeking LeClair's dismissal because of her substantive opinions of the case.

In *United States v. Thomas*, the Second Circuit held that a deliberating juror might be subject to dismissal if he engaged in misconduct (nullifying existing law), but not if there were reports suggesting that he merely doubted the sufficiency of the evidence: that he "want[ed] substantive evidence against" the defendants, and "to know that it's clear in my mind beyond a reasonable doubt." 116 F.3d 606, 623–24 (2d Cir. 1997). In this case, interviews with the members of the jury, including Juror LeClair, revealed no comparable explanation for LeClair's lack of candor.

In *United States v. Symington*, the Ninth Circuit held that it was an abuse of discretion to dismiss a juror where the "statements of some jurors indicated that their frustration with [the dismissed individual] may have derived more from their disagreement with her on the merits of the case, or at least from their dissatisfaction with her defense of her views." 195 F.3d 1080, 1083–84 (9th Cir. 1999). In contrast to *Symington*, the record in this case lacks statements by the jurors about LeClair's views of the merits, or about the jurors' dissatisfaction with LeClair's defense of her views.

The Second Circuit's holding in *United States v. Hernandez* is also distinguishable. The Second Circuit held that it weighed in favor of reversal that the trial court had "lavishly" praised jurors "for their efforts to persuade [a dismissed juror] to convict." 862 F.2d 17, 23–24 (2d. Cir. 1988). In contrast, here there is no indication in the record that the jurors attempted to persuade LeClair to convict, or that the court was even aware of Juror LeClair's view of the merits.

16

Finally, in *United States v. Kemp*, the Third Circuit *upheld* the decision to dismiss a deliberating juror where reports indicated there was cause for dismissal because the juror was improperly biased and refusing to deliberate or to discuss the evidence. 500 F.3d 257, 304–05 (3d Cir. 2007). In this case multiple jurors, including Juror LeClair, indicated that LeClair had not been candid during voir dire. Here, as in *Kemp*, there were clear indications on the record that there was cause for dismissal, and the court did not commit reversible error in removing LeClair.

The court also did not commit reversible error through the procedures it used to guard against prejudice from the substitution of a new juror. Fed. R. Crim. P. 24(c)(3) requires that a judge "ensure that a retained alternate does not discuss the case with anyone until that alternate replaces a juror or is discharged." In some cases, the district court has questioned the alternate juror before making a substitution; questioned each juror to make sure that he or she was able to recommence deliberations from the beginning; confiscated all written materials used during the initial deliberations; and repeated all of the jury instructions before the jury began deliberating anew. *See United States v. Street*, 614 F.3d 228, 235–36 (6th Cir. 2010) (citing *United States v. Moore*, 93 F. App'x 887, 893 (6th Cir. 2004); *United States v. Register*, 182 F.3d 820, 842-43 (11th Cir. 1999); *United States v. Cencer*, 90 F.3d 1103, 1109–10 (6th Cir. 1996); *United States v. Quiroz-Cortez*, 920 F.2d 418, 419–20 (5th Cir. 1992)). As this court noted in *Street*, however, these additional safeguards are not required by Rule 24(c)(3); rather, some cases have found these additional procedures to be "*sufficient* to prevent prejudice to the defendant, [but] not . . . *necessary* to do so." *Street*, 614 F.3d 235–36.

Patterson and Majors argue that, unlike in *Street*, where the court specifically told the alternate jurors at the close of trial not to talk about the case, "In this case, no effort was made to prevent prejudice to the defendant in designing the procedures that would be used were it necessary to substitute an alternate" because the court did not remind the alternate juror of her oath, nor did the court ask the alternate whether she had in fact discussed the case with anyone. The government counters that, "All Jurors were administered their oath on February 7, 2012. Jurors were admonished not to discuss the case on multiple occasions. . . . Jurors were admonished to begin deliberations anew." In addition, we have

often stated our presumption that jurors follow their instructions. *United States v. Neuhausser*, 241 F.3d 460, 469 (6th Cir. 2001). Here, the district court followed procedures to avoid prejudice in the substitution of a new juror, and, on balance, the district court did not commit reversible error.

Our conclusion with respect to this issue does not suggest approval of the court's decision to replace Juror LeClair. It would have been within the court's discretion, and perhaps even advisable, to have refrained from replacing the juror. But the district court had to choose a course of action not knowing how the jury was leaning or what Juror LeClair's views were with respect to a verdict. On the record as it existed at the time of the dismissal and substitution of the juror, the district court's action was neither an abuse of discretion nor in violation of any controlling precedent.

**F. Sufficiency of evidence (Majors)**

Majors' conviction is supported by sufficient evidence. When sufficiency is challenged, the standard is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Swidan*, 888 F.2d 1076, 1080 (6th Cir. 1989) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (internal quotation marks omitted)). Majors argues there was an improper basis for proof of the crimes for which he was convicted and sentenced because statements by the government cooperating witnesses were not corroborated by independent evidence. Majors' argument is misplaced because the "corroboration rule" to which he refers stands only for the proposition that a defendant may not be convicted of a crime based solely on his uncorroborated confession. *United States v. Brown*, 617 F.3d 857, 860 (6th Cir. 2010). It does not require corroboration of others' testimony.

Ample evidence supports Majors' conviction. At trial, the prosecution called approximately thirty witnesses, including cooperating witnesses Cleo Patterson, Bassim Fardos, Robert Bell, and Anthony Johnson. Majors was arrested in a vehicle that contained 26 kilograms of cocaine inside a hidden compartment. Cleo Patterson, the other individual in the vehicle at the time of the arrest, testified that he and Majors made multiple visits to California on behalf of Adrian Patterson, and that some of those visits were in a vehicle registered to Majors. Cleo Patterson also testified that the men were paid

with cocaine. Bassim Fardos testified that he knew Majors as Adrian Patterson's courier, and information from wiretaps confirmed that Fardos, Bell, and Adrian Patterson were involved in drug trafficking.

To the extent Majors is challenging the credibility of the government's witnesses, his arguments are foreclosed by the well-settled rule that "on appeal, there is no place . . . for arguments regarding a government witness's lack of credibility . . . Indeed, '[i]t is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story.'" *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999) (internal citations omitted). Nor does Majors raise an adequate challenge through his argument that the prosecutor erred by referring in his opening remarks to the prior consistent statements of government witness Robert Bell. For one thing, Majors never objected to the prosecutor's remarks. Moreover, any hypothetical error would be harmless given the overwhelming weight of the evidence against Majors.

## G. Sentencing (Majors)

Majors' sentence of 360 months' imprisonment is not procedurally or substantively unreasonable. On review of a sentence, "[a]ppellate courts must first ensure that the district court committed no significant procedural error." *United States v. Conatser*, 514 F.3d 508, 519–520 (6th Cir. 2008) (internal quotations and citations removed). The court then evaluates the sentence for substantive reasonableness. A sentence may be substantively unreasonable if the district court chooses it "arbitrarily, bases the sentence on impermissible factors, fails to consider relevant sentencing factors, or gives an unreasonable amount of weight to any pertinent factor." *Id*. at 520.

The district court committed no procedural error during sentencing, and the sentence ultimately imposed was substantively reasonable. The sentencing transcript indicates that the court relied on the presentence report with respect to the following points. Majors participated in the cocaine trafficking organization, helped to transport shipments of cocaine and drug proceeds between Tennessee and California, and had vehicles titled in his name that were used to transport drugs and drug proceeds. The conspiracy involved more than 150 kilograms of cocaine, for which Majors was responsible as a co-

conspirator. The district court relied on all of these findings, including Majors' extensive criminal history, in making its sentencing determination.

Majors' criminal history, which included misdemeanor arson, an assault, aggravated assault, and attempted aggravated robbery, together with the quantity of cocaine involved in the conspiracy, meant that Majors faced a Guidelines range of 360 months to life imprisonment. Majors requested a downward departure to 10 years' imprisonment because of his age and allegedly minor role in the conspiracy, arguing that he should only be held responsible for 26 kilograms of the more than 150 kilograms of cocaine involved in the conspiracy. The district court determined that Majors was not entitled to a minor-role adjustment and sentenced him to a term of imprisonment at the bottom of the Guidelines range, stating that the sentence was appropriate for specific and general deterrence, and considering Majors' age. The court recommended that the sentence be served in an institution where Majors could receive appropriate treatment for his medical conditions, and the court indicated that it had considered Majors' circumstances and age in determining to sentence Majors at the low end of the Guidelines range.

The crux of Majors' argument for unreasonableness is that his "circumstances were markedly different from those of the government's comparator Cleo Patterson," because Majors "was only a minimal or minor participant in the conspiracy, evidenced by the testimony at trial and the numerous stipulations of government that he was not the subject of the many ongoing investigations leading to the arrest of the codefendants and others." However, the facts listed by Majors—that he "had previously held jobs as a farmer, a truck driver, and 'odd jobs,'" that he had no involvement in multiple activities integrally related to drug dealing, and that he had not been "listed on any phone list held by conspirators dealing drugs"—do not render his sentence manifestly unreasonable. The court committed no procedural error in determining Majors' sentence, and the sentence was substantively reasonable. Majors' sentence was appropriate.

## H.  Sentencing (Patterson)

Patterson contests the application of a statutory recidivism enhancement to increase his sentence to a mandatory minimum of life. He recognizes that the enhancement is proper under *Almendarez-Torres*

*v. United States*, 523 U.S. 224 (1998), but argues that "*Almendarez-Torres* may not be valid in light of the *Booker, Shepard*, and *Alleyne* decisions." More specifically, Patterson argues his sentence violates the Sixth Amendment because "[i]t is possible that *Almendarez-Torres* has already been implicitly overruled in *Alleyne* because prior convictions cannot logically be distinguished from other enhancement factors that increase the statutory minimum." This court has repeatedly and emphatically rejected this argument. "*Almendarez-Torres* is still good law and will remain so until the Supreme Court explicitly overrules it." *United States v. Anderson*, 695 F.3d 390, 398 (6th Cir. 2012). "Although *Almendarez-Torres* may stand on shifting sands, the case presently remains good law and we must follow it until the Supreme Court expressly overrules it." *United States v. Mack*, 729 F.3d 594, 609 (6th Cir. 2013). More recently, in *United States v. Pritchett*, 749 F.3d 417, 434 (6th Cir. 2014), this court again made clear that *Almendarez-Torres* has not been overruled: "*Alleyne* did not disturb the holding in *Almendarez-Torres*." Patterson's sentence is valid.

III.

The judgments of the district court are AFFIRMED.

COLE, Chief Judge, concurring in part and dissenting in part. I agree with the majority opinion's resolution of most claims. I disagree, however, and respectfully dissent with respect to a single issue: whether the district court improperly removed and replaced Juror 6, at the foreperson's request, after nearly five hours of deadlocked deliberations. Because the record reflects a real possibility that the foreperson requested Juror 6's removal due to her view of the sufficiency of the government's evidence (*i.e.*, because she was a "holdout" juror), her removal was improper. Accordingly, I would vacate the defendants' convictions and remand the matter for a new trial.

## I. THE STANDARDS GOVERNING JUROR REMOVAL

The legitimacy of our criminal justice system depends, in large part, on the fairness of trials, the accuracy of verdicts, and the degree to which the system sensibly limits the power of government in relation to citizens accused of committing a crime. *See* Joshua Dressler & George C. Thomas III, Criminal Procedure: Principles, Policies, and Perspectives 51–61 (2d ed. 2003). The Sixth Amendment to the United States Constitution underscores these values by requiring a unanimous jury verdict in federal criminal trials. *See United States v. Ramos*, 861 F.2d 461, 465 (6th Cir. 1988) (citing *Apodaca v. Oregon*, 406 U.S. 404 (1972)). The Federal Rules of Criminal Procedure echo these concerns by providing that every defendant is presumed innocent unless and until a unanimous twelve-member jury returns a guilty verdict. *See* Fed. R. Crim. P. 23(b) ("A jury consists of 12 persons unless this rule provides otherwise."); Fed. R. Crim. P. 31(a) ("The verdict must be unanimous."). Typically, the same twelve jurors originally empaneled will deliberate and render a verdict. Nevertheless, the rules contemplate hiccups during trial and permit district courts to replace an empaneled juror with an alternate if the original juror becomes "unable" or "disqualified" from serving. Fed. R. Crim. P. 24(c).

Trial judges may remove a juror for a variety of reasons, including an obligation to appear in state court; difficulty concentrating due to a death in the juror's family; holiday travel plans; taking a child to college; or attending college courses oneself. *United States v. De Oleo*, 697 F.3d 338, 342 (6th Cir. 2012) (collecting cases). Similarly, a "lack of candor [during *voir dire*] and a failure to abide by instructions"

constitute valid grounds for removing a juror. *United States v. Ebron*, 683 F.3d 105, 128 (5th Cir. 2012); *United States v. Cantu*, 229 F.3d 544, 549–50 (6th Cir. 2000) (holding that removal was proper where juror failed to respond candidly during *voir dire*). Our court generally reviews the decision to replace a juror with an alternate for an abuse of discretion. *De Oleo*, 697 F.3d at 342.

Trial judges may not, however, remove a juror during deliberations "if the request for discharge stems from doubts the juror harbors about the sufficiency of the evidence." *United States v. Brown*, 823 F.2d 591, 596 (D.C. Cir. 1987); *see United States v. Hernandez*, 862 F.2d 17, 23 (2d Cir. 1988) ("That a juror may not be removed because he or she disagrees with the other jurors as to the merits of a case requires no citation."); *United States v. Thomas*, 116 F.3d 606, 621 (2d Cir. 1997) ("[T]o remove a juror because he is unpersuaded by the Government's case is to deny the defendant his right to a unanimous verdict."); *see also United States v. Simpson*, 191 F.3d 454, at *2–3 (6th Cir. 1999) (unpublished opinion) (upholding a juror's removal but specifically noting that the juror was dismissed due to health reasons and not because she may have harbored doubts about the government's case). Permitting the removal of a juror due to her view of the case would render the right to a unanimous jury verdict "illusory." *Brown*, 823 F.2d at 596; *cf. Ramos*, 861 F.2d at 465 (citing *Apodaca*, 406 U.S. at 404, in which five concurring or dissenting justices of the Supreme Court agreed that the Sixth Amendment requires a unanimous verdict in *federal* criminal cases).

In many cases, a trial judge can determine whether removal is warranted "without *any* inquiry into the juror's thoughts on the merits of the case." *Thomas*, 116 F.3d at 620–21 (collecting cases where the request for removal stemmed from a particular event, competing obligation, or relationship between the juror and the parties). In those cases, the request for removal will be clear on its face, and the judge may freely investigate the basis for removal without intruding into the secrecy of the deliberative process. *Id.* In rare instances, the request for removal will be equally clear but plainly improper—*i.e.*, the request will stem solely from one juror's status as a "holdout" from returning a guilty verdict. *See Brown*, 823 F.2d at 596. Here again, the judge may act upon the request without breaching the secrecy of

deliberations: "the judge must either declare a mistrial or send the juror back to deliberations with instructions that the jury continue to attempt to reach agreement." *Id.*

But what happens when the reasons underlying a request to remove a juror are unclear? What should trial courts do when confronted with a request that hints both at good cause for removal *and* a desire to replace a "holdout" juror? *See, e.g.*, *United States v. Kemp*, 500 F.3d 257, 302 (3d Cir. 2007); *Brown*, 823 F.2d at 596. Circuit courts are split on this issue.

On one hand, the District of Columbia and Second Circuits have placed a premium on the secrecy of jury deliberations by limiting the trial courts' ability to inquire into allegations of jury bias, jury nullification, or a failure to follow the court's instructions. *See Brown*, 823 F.2d at 596 ("[U]nless the initial request for dismissal is transparent, the court will likely prove unable to establish conclusively the reasons underlying it. Given these circumstances, we must hold that if the record evidence discloses *any possibility* that the request to discharge stems from the juror's view of the sufficiency of the government's evidence, the court must deny the request." (emphasis added)); *Thomas*, 116 F.3d at 622 ("We adopt the *Brown* rule as an appropriate limitation on a juror's dismissal . . . . This evidentiary standard protects not only against the wrongful removal of jurors; it also serves to protect against overly intrusive judicial inquiries into the substance of the jury's deliberations."). *Brown* and *Thomas* thus focused more closely on the initial request for removal rather than on the trial judge's ultimate determination as to whether removal was warranted. As the Second Circuit aptly recognized, this standard might "leave[] open the possibility that jurors will engage in irresponsible activity that will remain outside the court's power to investigate," but "[t]o open the door to the deliberation room any more widely and provide opportunities for broad-ranging judicial inquisitions into the thought processes of jurors would . . . destroy the jury system itself." *Thomas*, 116 F.3d at 622.

On the other hand, several circuits have adopted the *Brown* rule (or slight variations of it) while permitting district courts to inquire more fully into the deliberative process to ferret out juror misconduct.

*See, e.g.*, *Kemp*, 500 F.3d at 304; *United States v. Abbell*, 271 F.3d 1286, 1302–04 (11th Cir. 2001) (per curiam), *rev'd on other grounds by Cuellar v. United States*, 553 U.S. 550 (2008).  For example, in *Kemp*, the Third Circuit endorsed a variation of the *Brown* rule that provides, "if the record evidence discloses any *reasonable* possibility that the impetus for a juror's dismissal stems from the juror's views on the merits of the case, the court must not dismiss the juror."  500 F.3d at 303 (quoting *United States v. Symington*, 195 F.3d 1080, 1087 (9th Cir. 1999)).  But there, the court permitted lengthy questioning of the individual jurors to determine if a particular juror engaged in misconduct during deliberations.  *Id.* at 301–02 (holding that district courts may investigate allegations of juror misconduct after deliberations have begun when presented with "substantial evidence" of that misconduct); *accord Abbell*, 271 F.3d at 1302–04 (adopting a variation of the *Brown* rule but focusing on the evidence of misconduct that the district court discovered during its investigation).

Our circuit has not considered facts on all fours with the *Brown*, *Thomas*, *Kemp*, and *Abbell* line of cases.  But I believe the better approach requires an abundance of caution—particularly where, as here, the request to remove a juror occurs against the backdrop of deadlocked jury deliberations.  Accordingly, I would join the District of Columbia and Second Circuits in adopting the *Brown* rule, which provides that "if the record evidence discloses any possibility that the request to discharge stems from the juror's view of the sufficiency of the evidence, the court must deny the request."[1]  *Brown*, 823 F.2d at 596.

## II.  REMOVING JUROR 6 WAS IMPROPER

The instant appeal involves a close call, even under the strict limitations from *Brown*. Nevertheless, a careful review of the record demonstrates that removal of Juror 6 was improper.  The record shows that the jury was deadlocked after nearly five hours of deliberations; that the jury had already sent the judge one note stating, "we cannot reach a unanimous decision on either Defendant"; that

---

[1] Several other circuits have adopted the *Brown* rule but have modified slightly the language employed. *See, e.g.*, *Kemp*, 500 F.3d at 304; *Symington*, 195 F.3d at 1087 & n.5.

in response, the judge issued a modified *Allen* charge, instructing the jury to continue their deliberations; and that only then, on the second day of deliberations, did the foreperson send the judge the following note, requesting to remove Juror 6:

> Judge Nixon, one of the Jurors overheard a fellow Juror [Juror 6] commenting on having prior information about drug dealing that she did not reveal during Jury selection. I feel that this prior information could perhaps be influencing her ability to reach a fair decision and should have been made known during the selection process. Thus, can we consider removing this Juror and using one of the Alternates?

The foreperson's note, when viewed in light of the deadlocked deliberations, implicates a core concern that the *Brown* and *Thomas* cases explicitly discussed—namely, the improper targeting of a "holdout" juror.

> Consider a case where, for example, a strong majority of the jury favors conviction, but a small set of jurors—perhaps just one—disagrees. The group of jurors favoring conviction may well come to view the "holdout" or "holdouts" not only as unreasonable, but as unwilling to follow the court's instructions on the law. The evidentiary standard that we endorse today . . . serves to protect these holdouts from fellow jurors who have come to the conclusion that the holdouts are acting lawlessly.

*Thomas*, 116 F.3d at 622; *see also Brown*, 823 F.2d at 596. While *Brown* and *Thomas* dealt specifically with jury nullification, "[their] reasoning applies with equal force to claims of juror bias" or other alleged juror misconduct. *See Kemp*, 500 F.3d at 303.

Under these circumstances, it seems there is at least *some* possibility, perhaps even a reasonable possibility, that the request to remove Juror 6 stemmed from her status as a "holdout." Not surprisingly, counsel for the defendants objected to her removal. Defense counsel specifically argued that, at that point in the proceedings, the jury was deadlocked, and that a court may not remove a juror solely to avoid a hung jury, citing *Hernandez*, 862 F.2d at 23.

Faced with these competing concerns, the district court conducted limited hearings under the teachings of *Remmer v. United States*, 347 U.S. 227 (1954), and interviewed the relevant jurors in the presence of counsel. Judge Nixon proceeded with care at the outset of each interview by reminding the jurors that he did not want to discuss the status of deliberations or the leanings of the jury. Rather, he

only wanted to determine whether Juror 6 had in fact made statements during deliberations that she should have divulged during *voir dire*.

The interviews began with the foreperson, who stated that she had not heard the statements in question; that she was merely serving as a liaison between other jurors and the judge. The foreperson did, however, volunteer "**that the Juror that reported it to me indicated that it was prejudicing [Juror 6] against this trial.**" (emphasis added). This comment, though unsolicited, speaks to Juror 6's view of the case.

The judge then turned his attention to the two jurors who claimed to have heard the statements. The first juror described Juror 6's comments as follows:

> JUROR 7: I may be completely wrong. But it just seemed—when we were talking about certain things, when we were deliberating, she mentioned that she knew some people like that, what we were—as far as what—kind of like what's involved in this type of case. That's all she said.

The second juror who claimed to have overheard the relevant statements described them in more detail as follows:

> THE COURT: I just want to ask you about a conversation you heard—perhaps overheard or perhaps addressed to you by [Juror 6] about something about drug dealing?
>
> JUROR 8: If—what I think you are referring to is she mentioned that she knew people that did drugs and knew people that trafficked in drugs. Is that what you're asking?
>
> THE COURT: Yes.
>
> JUROR 8: Okay. Yes, I heard that as well.

So far, so good. But then, the district court's questioning turned from whether Juror 6 made the comments in question (a permissible inquiry) to whether the comments were influencing her view of the case (an impermissible inquiry). The following exchange shows where the court crossed the line:

> THE COURT: *Did she say anything about that [knowing people who used drugs] and how that influenced her one way or another*? If you don't recall, that's fine.
>
> JUROR 8: Let me think about that for a little bit.

27

THE COURT: ***Did she indicate*** what that was—***how she was thinking as a result of knowing that?***

JUROR 8: She didn't—

COUNSEL: I'm sorry. I didn't hear the Court's question.

THE COURT: ***I asked him, did she express a feeling because of what she had known?***

JUROR 8: She mentioned at two different times that she knew people that used drugs and dealt drugs and that she'd seen it—one time she mentioned that she'd seen it being dealt, and another time she mentioned that she never actually saw the people dealing the drugs.
          ***I don't think she ever in the same conversation tied together that that is how she was influenced.***

THE COURT: Okay.

JUROR 8: ***I think there are other factors that—and I don't know if I can say something without you directly asking me.***

(emphasis added).

In sum, the record evidence reveals the following: (1) a deadlocked jury; (2) a district court with knowledge of the jury's inability to reach a unanimous verdict; (3) a group of three jurors, including the foreperson, actively requesting Juror 6's removal due to doubts about her "ability to reach a fair decision"; (4) a statement to the judge indicating that Juror 6's comments were "prejudicing her against this trial"; (5) questions from the judge to a complaining juror surrounding Juror 6 and how she was "influenced," "thinking," and "feeling" about the case; and (6) a statement from a complaining juror to the judge indicating that Juror 6 was indeed influenced in some manner, be it by her knowledge of people who used and dealt drugs or "other factors." Faced with this evidence, the district court removed Juror 6 with little fanfare, stating only, "All right, I'm going to remove [her] from this Jury and replace her with [an alternate]."

Without questioning the district court's credibility determinations, second-guessing whether the government's questions during *voir dire* should have elicited a response, or suggesting that the court removed Juror 6 to avoid a hung jury—I believe the proceedings below still run afoul of the *Brown* rule.

At bottom, the record discloses a real possibility that the foreperson's request to remove Juror 6, which the government happily joined, stemmed from her view of the case.[2] *See Brown*, 823 F.2d at 596. While the record also reveals that Juror 6 may have lied during *voir dire*, the *Brown* rule focuses on the initial request for removal rather than on the trial judge's ultimate determination as to whether that removal is warranted. *See id.* Although the court initially tried to limit its investigation to what Juror 6 *said* during deliberations, the court's questioning, coupled with the individual jurors' responses (both solicited and unsolicited), improperly intruded into the secrecy of the jury's deliberations. These are precisely the harms that *Brown*, *Thomas*, and their progeny warned of when allegations of juror misconduct arise after deliberations begin. *See Symington*, 195 F.3d at 1087 ("[The *Brown*] rule is attentive to the twin imperatives of preserving jury secrecy and safeguarding the defendant's right to a unanimous verdict from an impartial jury."). In sum, while there may indeed have been cause to remove Juror 6, the district court should not have done so because it is more important to preserve the secrecy of jury deliberations than to remove a single juror, even one who may have acted irresponsibly. *See Thomas*, 116 F.3d at 622 ("[t]o open the door to the deliberation room any more widely and provide opportunities for broad-ranging judicial inquisitions into the thought processes of jurors would . . . destroy the jury system itself.").

I recognize the difficulty that this rule imposes upon district courts, and I have no doubt the court meant well when it attempted to investigate the allegations of juror bias in this case. *See Thomas*, 116 F.3d at 622 ("We recognize that this standard—buttressing the core principle of the secrecy of jury deliberations—leaves open the possibility that jurors will engage in irresponsible activity that will remain outside the court's power to investigate. It is an imperfect rule, no doubt, but one fully consistent with our history and traditions."). But we must not lose sight of the fundamental role that juries play in our criminal justice system. Secrecy and unanimity remain paramount to that role, and the *Brown* rule, "imperfect" though it may be, best protects both aims. *Id.* Therefore, I respectfully dissent.

---

[2] Though Judge Nixon could not have predicted what would happen after Juror 6's removal, the fact that the newly comprised jury (which was required and instructed to begin deliberations anew) returned a guilty verdict just over an hour later reinforces the inference that Juror 6 was indeed the lone "holdout" from a unanimous verdict.