RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 10a0216p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

UNITED STATES OF AMERICA,

               *Plaintiff-Appellee,*

    *v.*

SAM J. STREET,

               *Defendant-Appellant.*

No. 08-6242

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 08-00007-002—J. Ronnie Greer, District Judge.

Argued: June 10, 2010

Decided and Filed: July 23, 2010

Before: BATCHELDER, Chief Judge; SUTTON and KETHLEDGE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Bernard A. Eskandari, MUNGER, TOLLES & OLSON LLP, Los Angeles, California, for Appellant. Zachary C. Bolitho, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, for Appellee. **ON BRIEF:** Bernard A. Eskandari, Derek J. Kaufman, MUNGER, TOLLES & OLSON LLP, Los Angeles, California, for Appellant. Zachary C. Bolitho, ASSISTANT UNITED STATES ATTORNEY, Knoxville, Tennessee, Caryn L. Hebets, ASSISTANT UNITED STATES ATTORNEY, Johnson City, Tennessee, for Appellee.

_____

**OPINION**

_____

SUTTON, Circuit Judge. The central issue in this case is whether the police violated the Fourth Amendment during a traffic stop—and most particularly whether an officer permissibly grabbed Sam Street's arm after he reached into his pocket during the stop and after he had exited his car.

1

I.

On January 23, 2008, police in Washington County, Tennessee received a tip from an informant that a methamphetamine sale would take place later that day at the Waffle House in Boones Creek, Tennessee. According to the informant, the seller, Randall Street, would arrive at the Waffle House in a black Ford Mustang with low profile tires, tinted windows, a rear spoiler and dealer tags. Randall would be joined by one person, the informant added, and would arrive via Interstate 26.

Later that day, officers on the Interstate saw a Mustang matching the informant's description heading toward Boones Creek. Waiting in a lot adjacent to the Waffle House with several other officers, Sergeant William Gregg saw the black Mustang approach the meeting point and noticed that neither the driver nor the passenger wore a seat belt. *See* Tenn. Code Ann. § 55-9-603.

When Lieutenant Tom Remine learned about the traffic violation, he stopped the Mustang, and asked the driver, Randall's uncle Sam Street, to exit the vehicle. As Street walked toward the rear of the car, Investigator Sam Phillips saw him "stick his hand in his pocket and grab something." R.67 at 75. Concerned that Street was reaching for a weapon, Phillips grabbed Street's arm and asked "if he had anything in his pocket." R.61 at 9. When Street said he had a pistol, Phillips removed Street's hand from his pocket, reached in and retrieved a .38 snub-nosed revolver. Street admitted he did not have a permit to carry the concealed weapon. *See* Tenn. Code Ann. §§ 39-17-1307(a)(1), 39-17-1308(a)(2).

Gregg asked Randall to step out of the car, reasoning that "with the driver being armed . . . the passenger may be armed" as well. R.61 at 10. He frisked Randall for weapons and "felt three bulges in his left coat pocket," which Randall admitted were drugs. R.61 at 11. The bulges turned out to be three silver balloons filled with crystal methamphetamine. The officers arrested Street and Randall. When Street arrived at the detention center, a booking search yielded one more item: a set of digital scales in his jacket pocket.

A federal grand jury indicted Street and Randall, together with two co-conspirators, for conspiring to possess and distribute methamphetamine. *See* 21 U.S.C. §§ 841(a)(1), 846.

It also indicted Street and Randall for possession with the intent to distribute methamphetamine, *see* 21 U.S.C. § 841(a)(1), and Street for possessing a firearm in furtherance of a drug-trafficking offense, *see* 18 U.S.C. § 924(c).

Street moved to suppress the evidence obtained from the search in the Waffle House parking lot, arguing that it violated his Fourth Amendment rights. After holding a suppression hearing, the magistrate judge found that "officer safety" concerns justified the search. R.60 at 7. The district court adopted the magistrate's recommendation.

Randall and the two other co-conspirators pled guilty to the indictment and agreed to cooperate with law enforcement, leaving Street to stand trial alone. At trial, Randall pointed the finger at Street, saying that his uncle had asked him to help sell seven ounces of methamphetamine. Although Randall admitted contacting the informant about the sale, it was Street, he testified, who dealt with the suppliers and who set the transaction in motion.

The trial ended at mid-day on May 1, 2008, and the jury deliberated during the afternoon. At the end of the day, the foreman asked the court to allow the jurors to go home for the evening, but also informed the court (for the first time) that one of the jurors would be unavailable the next day. The court asked counsel for input. Street's attorney said he "would prefer to allow that juror to go as opposed to forcing him to come back . . . [a]nd would rather not make them work tonight. . . . I would rather substitute the alternate." R.129 at 81. The government did not object to this suggestion, and the court accepted the proposal, instructing the jurors to "begin [their] deliberations anew" with the new member the next morning. R.130 at 3. On May 2, 2008, after about three hours of deliberation, the jury returned a guilty verdict on all three counts. The court sentenced Street to a 138-month prison term. He appeals.

## II.

### A.

Street first argues that the district court erred in rejecting his suppression motion under the Fourth Amendment. We do not think so, as the police had a legitimate basis for their actions at each stage of the encounter.

*The officers legitimately stopped Street's car.*  When law enforcement officers witness a traffic violation, they may stop the driver and his car.  The warrant requirement generally does not apply to transient items, such as a car.  "Before a warrant could be secured the automobile would be beyond the reach of the officer." *Carroll v. United States*, 267 U.S. 132, 146 (1925); *see Almeida-Sanchez v. United States*, 413 U.S. 266, 269 (1973).  And there is nothing "unreasonable" about stopping a vehicle whose driver has just committed a traffic violation.  *See Whren v. United States*, 517 U.S. 806, 810 (1996).  In this instance, Sergeant Gregg saw that the two occupants of the black Mustang were not wearing seatbelts, which offends Tennessee law.  *See* Tenn. Code Ann. § 55-9-603.  While this traffic violation is not an arrestable offense, *see* Tenn. Code Ann. § 55-9-603(f)(1), that does not divest the police of authority to stop the car, *see Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977) (approving of stop to issue traffic summons for expired license plate); *see also Virginia v. Moore*, 553 U.S. 164, 176 (2008) (upholding constitutionality of arrest for a non-arrestable traffic violation).

In passing, Street questions how Gregg could have seen a seatbelt violation from several dozen yards away.  But he never denies that he violated the law, or for that matter challenges the district court's finding that Gregg saw the violation.  Street also suggests, again in passing, that the stop was "pretextual," Street's Br. at 16, in the sense that the officers stopped the car not because Street and Randall were seatbelt-less but because an informant tipped them about the pending drug sale.  But *Whren* puts an end to inquiries about an officer's state of mind in conducting a traffic stop.  *See* 517 U.S. at 813.  The question after *Whren* goes not to the subjective motives of the officer's actions but to the objective reality (or not) of whether the officers had probable cause to believe that a crime, including a traffic violation, had occurred.  *See id.* at 810–13.

*The officers legitimately asked Street to get out of the car.*  In the course of a stop premised on a traffic violation, police may instruct the driver or occupant to exit the vehicle.  *Mimms*, 434 U.S. at 111.  Traffic stops are "fraught with danger to police officers," *Michigan v. Long*, 463 U.S. 1032, 1047 (1983), and the Fourth Amendment permits officers to conduct an otherwise-legitimate stop on their own terms—whether by keeping the driver (and occupants) in the car or by asking them to exit the car, *see Maryland v. Wilson*, 519 U.S. 408, 415 (1997); *Mimms*, 434 U.S. at 111, depending on what they perceive as safer.

Having stopped Street for a traffic violation, the police permissibly asked Street to get out of the car.

*Officer Phillips legitimately grabbed Street's arm when he reached into his pocket and permissibly asked him whether he had anything in his pocket.* As Street walked to the rear of the car, Officer Phillips noticed him "stick his hand in his pocket and grab something." R.67 at 75. Concerned that Street was reaching for a weapon, Phillips grabbed Street's arm and asked "if he had anything in his pocket." R.61 at 9. Grabbing Street's arm was a minor infringement on his physical liberty, one proportionate to the risk created by a suspect's reaching into his pockets during a traffic stop and commensurate to other common (and commonly accepted) exercises of physical control during a stop prompted by probable cause to suspect a violation of law, including: removing a driver or passenger from a car; directing the suspects where to stand; directing them where to place their arms during the encounter; and for that matter holding their arms as officers escort them to a specific location. In all of these settings, the officer has two eminently legitimate reasons for maintaining physical control over the situation and over the location of a suspect's arms and hands: a safety risk to the officer and the risk that the suspect will destroy or hide evidence of wrongdoing.

Phillips' actions came well within these accepted features of police practice and reasonably responded to the risks at hand. Keep in mind that the officer did not immediately reach into Street's pocket, and he did not demand that Street empty his pockets. Instead, he held Street's arm while waiting for the answer to the question that would have been on any officer's mind: Do you have anything in your pockets? Nor did the question itself raise the Fourth Amendment stakes of the encounter. "[M]ere police questioning does not constitute" a search or seizure. *Muehler v. Mena*, 544 U.S. 93, 101 (2005).

Street responds that the officer could have done less. The officer could have *said* to Street that placing his hand in his pocket made the officer uncomfortable and asked him whether he had any items in his pocket. The officer, true enough, could have taken this step, and it would have been less liberty-infringing than grabbing Street's arm. But the Fourth Amendment demands reasonableness, not unforgiving scrutiny; it demands that the officer take sensible steps given the circumstances of the encounter, not that he take the least

intrusive steps imaginable. *See City of Ontario, Cal. v. Quon*, ___ U.S. ___, Slip Op. at 15 (2010) ("This Court has repeatedly refused to declare that only the 'least intrusive' search practicable can be reasonable under the Fourth Amendment."); *Terry v. Ohio*, 392 U.S. 1, 7 (1968) ("Officer McFadden *grabbed* petitioner Terry [and] *spun* him around" (emphasis added)).

Breaking the encounter down into these individual pieces, Street adds, unfairly diminishes the cumulative effect of the officer's actions. The officer's arm hold as he asked Street whether he had anything in his pocket amounted to a "search," all before he admitted to possessing a gun. Reply Br. at 4. Put another way, Street says, it was the combination of the physical act (grabbing his arm) and the verbal act (asking him whether he had anything in his pocket) that amounted to a "[c]oercive" search. Reply Br. at 5.

There is a kernel of truth to a premise of this argument, but it does not suffice to invalidate this seizure. Several cases confirm that words alone may amount to a search. *See, e.g.*, *Safford Unified Sch. Dist. No. 1 v. Redding*, ___ U.S. ___, 129 S. Ct. 2633, 2641–42 (2009) (school officials' verbal orders treated as a "search"); *United States v. Reyes*, 349 F.3d 219, 225 (5th Cir. 2003) (border officer's verbal order to empty pockets and lift shirt treated as a *Terry* weapons search); *United States v. Dalpiaz*, 494 F.2d 374, 377 (6th Cir. 1974) (airport security officer's verbal order to empty pockets constituted a justified "limited search" under *Terry*); *United States v. Foust*, 461 F.2d 328, 331 (7th Cir. 1972) (state-employed security guard's verbal order to empty pockets treated as search for Fourth Amendment purposes). As these cases confirm, an officer may not sidestep the requirements of the Fourth Amendment by directing a suspect to "empty your pockets," then disclaim any constitutional violation on the ground that he verbally directed the suspect to act without touching or in any way searching him.

But this encounter did not amount to a verbal search. The officer asked Street (according to Phillips) "if he had a weapon," R.67 at 75, or (according to Gregg) "if he had anything on him," R.61 at 9, or (as synthesized by the magistrate) "if he had anything in his pocket," R.60 at 4. In context, these sorts of questions are not the verbal equivalent of reaching into a suspect's pocket to remove the contents, *see United States v. Casado*, 303 F.3d 440 (2d Cir. 2002), or the same as ordering a suspect to "empty his pockets" in the

midst of a protective frisk, *see State v. Hlavacek*, 407 S.E.2d 375, 378 (W. Va. 1991). Sometimes a question is just a question—and an eminently reasonable question at that. That is all that happened here.

Street adds that we may not rely on the first-time informant's tip—to the effect that Street's nephew was about to engage in a drug sale—in deciding whether the officer's hand grab and question were legitimate. Street may or may not be right about the point, but it makes no difference. With or without the information, the officer had a legitimate safety reason for grabbing Street's arm and asking him whether he had anything in his pocket before letting him remove his hand from his pocket.

*Officer Phillips legitimately searched Street's pocket after Street admitted that he was carrying a handgun.* In response to the officer's question, Street admitted that he had a pistol, after which Phillips removed Street's hand from his pocket, reached into the pocket and retrieved a .38 snub-nosed revolver. Street's admission to the police that he was carrying a gun confirmed the officers' "reasonable suspicion" (indeed probable cause to believe) that he was armed, *see Arizona v. Johnson*, ___ U.S. ___, 129 S. Ct. 781, 784 (2009), permitting Phillips to reach into Street's pocket and confirm it contained a weapon. Street admitted he did not have a permit for the concealed weapon, *see* Tenn. Code Ann. §§ 39-17-1307(a)(1), 39-17-1308(a)(2), and accordingly the officer permissibly seized it. Street does not quarrel with this aspect of the encounter. All aspects of the encounter considered, the police did not violate the Fourth Amendment during the search and arrest of Street.

### B.

Street turns to the district court's substitution of an alternate juror in the midst of deliberations, complaining that the court "failed to employ adequate procedures to safeguard the fairness of jury deliberations." Street's Br. at 29. There are two flaws with this argument.

First, as Street acknowledges, he consented to the substitution and the resulting jury instruction. He cannot "agree in open court with [the] judge's proposed course of conduct and then charge the court with error in following that course." *United States v. Aparco-*

*Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002). That is a waiver, pure and simple. We do not review waived claims of juror substitution. *See United States v. Cencer*, 90 F.3d 1103, 1106–07 (6th Cir. 1996).

Second, even when Street attempts to put a finer point on the matter by arguing that the court failed to employ *additional* "well-established procedural safeguards" when making the jury substitution, that does not help him. Neither the court nor Street mentioned these additional measures, it is true, meaning he could not have "affirmatively consent[ed]" to them. *See* Reply Br. at 24. But that feature of the case has the modest virtue of moving Street from a non-existent argument to a weak one. If he did not bring these concerns "to the court's attention," that necessarily means he forfeited the claims and accordingly the rigors of plain-error review apply. Fed. R. Crim. P. 52(b); *see United States v. Olano*, 507 U.S. 725, 736–37 (1993). No such error occurred.

Rule 24(c)(3) allows a court to "retain alternate jurors after the jury retires to deliberate," so long as it "ensure[s] that a retained alternate does not discuss the case with anyone" during deliberations. "If an alternate replaces a juror after deliberations have begun," the rule says, "the court must instruct the jury to begin its deliberations anew." *Id.* The district court followed these instructions to a tee. At the close of the trial, after giving the jury all of its instructions, the court turned to the two alternate jurors and said,

> I'm going to ask that you remain here during deliberations. . . . You should not talk about this case even between yourselves during deliberations . . . nor should you talk to anyone else about it. You simply shouldn't talk about it until a verdict is reached. There's always a possibility until a verdict is reached that one or both of you could be called upon to deliberate with the jury.

R.129 at 76. That evening, after replacing one of the jurors with an alternate, the court again reminded the jurors "not to talk about this case, even among yourselves, nor are you to allow anyone to talk to you about the case or talk about the case in your presence." *Id.* at 88. The court continued by instructing the 11 remaining original jurors "not [to] make firm opinions or firm decisions about your views in this case. Keep an open mind until you can deliberate this case with all 12 jurors." *Id.* at 89. The next morning, the court reminded the jury to "set aside and disregard your earlier deliberations and begin your deliberations anew. This is because a jury verdict must be the product of the deliberations of all 12 people who reach

that verdict." R.130 at 3. The district court did everything the federal rule requires, and as a result no error, plain or otherwise, occurred.

Street says that the court should have given additional precautions designed to "prevent defendant prejudice." Street's Br. at 33. For example: the district court should have questioned the alternate juror before placing her on the jury to make sure she had not discussed the case with the other alternate during the jury's first deliberations; the court should have questioned each original juror individually, asking if they could begin deliberations anew; the court should have confiscated all written material used during the deliberations; and the court should have repeated *all* of the jury instructions before the jury began deliberating with the new member, "including an additional admonition to start anew." Street's Br. at 34–35. While the court presumably had authority to add these safeguards, Street offers no authority indicating that Rule 24(c)(3) requires them. All he has found are cases describing these additional procedures as *sufficient* to prevent prejudice to the defendant, not as *necessary* to do so. *See, e.g.*, *United States v. Moore*, 93 F. App'x 887, 893 (6th Cir. 2004); *United States v. Register*, 182 F.3d 820, 842–43 (11th Cir. 1999); *Cencer*, 90 F.3d at 1109–10; *United States v. Quiroz-Cortez*, 960 F.2d 418, 419–20 (5th Cir. 1992). No error occurred.

## C.

That leaves Street's sufficiency claim—that the government did not present enough evidence to prove that he possessed a firearm "in furtherance" of a drug trafficking crime. 18 U.S.C. § 924(c). Here, too, we have a preservation issue. Street moved for acquittal at the close of the government's case in chief, but he failed to renew that motion "at the close of all the proofs," *United States v. Childs*, 539 F.3d 552, 558 (6th Cir. 2008). That oversight is nearly fatal to his sufficiency challenge, as it limits our review "to determining whether there was a manifest miscarriage of justice." *Id.* (quotation marks omitted). Nothing of the sort happened here.

To prove a violation of § 924(c), the government must show a "specific nexus between the gun and the crime charged." *United States v. Mackey*, 265 F.3d 457, 462 (6th Cir. 2001). Any nexus must amount to more than possession during a drug crime, as the firearm must "advance, promote, or facilitate the crime." *United States v. Paige*, 470 F.3d

603, 609 (6th Cir. 2006).  The jury had the following evidence before it:  Street was a methamphetamine dealer who asked his nephew to set up a drug sale; he arrived at the sale with an illegally concealed, loaded .38 snub-nosed revolver easily accessible in his pocket; he had a set of digital scales in his pocket—scales often used by drug dealers; his nephew, riding with him in the car, carried several ounces of methamphetamine; and a DEA agent testified that drug dealers often carry guns to protect themselves and their drugs.  From all of this, a reasonable jury could conclude that Street carried a firearm to facilitate the drug sale.  *See Mackey*, 265 F.3d at 462.

III.

For these reasons, we affirm.