NOT RECOMMENDED FOR PUBLICATION
File Name: 23a0028n.06

No. 21-1723

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Jan 12, 2023
DEBORAH S. HUNT, Clerk

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE WESTERN DISTRICT OF MICHIGAN |
| QUINTIN ANDRE CONLEY, | ) ) | |
| Defendant-Appellant. | ) ) ) | OPINION |

Before: SUHRHEINRICH, CLAY, and DAVIS, Circuit Judges.

**CLAY, Circuit Judge.** In July 2021, Defendant Quintin Andre Conley pleaded guilty to possession with intent to distribute controlled substances in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and (b)(1)(C). The district court sentenced Conley to 120 months in custody. On appeal, Conley challenges the district court's denial of his motion to suppress and its application of a two-level sentencing enhancement. The Court **AFFIRMS** for the reasons set forth below.

## I.    BACKGROUND

### A.    Factual Background

In the fall of 2020, a confidential informant told investigators that Conley possessed firearms and sold illegal drugs. According to the informant, Conley drove a white Jeep SUV and spent time in Muskegon, Michigan. In response to those tips, Detective Steve Liskey commenced an investigation. During his investigation, Liskey corroborated some of the informant's tips. For example, Liskey learned that Conley owned a white Jeep. Subsequently, investigators learned more through the Law Enforcement Information Network (the "LEIN"), which is a database upon

which police officers often rely. The LEIN indicated that the Jeep lacked valid insurance and that Conley lacked a valid driver's license.

In October 2020, investigators observed Conley driving the white Jeep. Liskey acknowledged in the moment that he lacked probable cause to search the Jeep, but he instructed Michigan State Police Trooper Matthew Rose to stop Conley for driving without insurance. Liskey hoped that by pulling Conley over, investigators could ultimately find justification to search the car lawfully.

Rose followed Liskey's instructions and pulled Conley over.[1] The dash camera video shows Rose and his partner approaching the Jeep calmly, and without any weapons drawn. When Rose reached Conley's window, he asked Conley for the vehicle's paperwork. Rose then told Conley that it appeared that the Jeep lacked insurance coverage, but he did not mention the suspected license violation. Rose testified later that he did not share that information because he wanted to make the stop appear as routine as possible. Next, Rose asked Conley for identification and Conley responded that he did not have any on him. Shortly thereafter, Conley's girlfriend, who was riding in the passenger seat, produced proof of insurance.

After acknowledging that Conley had produced proof of insurance, Rose asked Conley to step out of the vehicle. Rose testified that he removed Conley from the vehicle in accordance with his "typical procedure" for drivers who lack proper identification. Hr'g Tr., R. 55, Page ID #369. Conley exited the vehicle promptly and cooperatively. The parties dispute what happened next. Rose testified that as Conley exited the vehicle, Rose saw an electronic digital scale in the driver's door pocket. Such scales are, according to Rose, commonly associated with drug dealing. Conley

---

[1] Much of the factual summary that follows is based upon the Court's review of dash camera videos. *See Ashford v. Raby*, 951 F.3d 798, 800 (6th Cir. 2020) ("In describing what happened, we rely mainly on undisputed video footage from police dashboard cameras on the scene.").

avers that Rose's testimony lacks credibility. Rose could not have seen the scale, Conley argues, because: (1) it was dark out; (2) Rose did not point a flashlight at the door; and (3) officers did not point their spotlight or headlights at the door. In addition, Conley points to the fact that Rose did not mention the scale until about fifteen minutes after Conley exited the Jeep. The district court ultimately credited Rose's testimony on the matter.

Rose asked if Conley had any weapons on him and Conley said that he did not. Rose then asked Conley if he was "good with [Rose] checking real quick" and the video reveals that Conley responded in the affirmative. Def.'s Ex. A, R. 58, Page ID #479.[2] Conley then put his hands in the air, which the district court later held signified Conley's consent to the pat down.

Rose conducted an open-palmed pat down. According to Rose's testimony, during the pat down, he felt what he believed was a bag of drugs. Rose reached into Conley's pocket and discovered a bag containing two ounces of methamphetamine. After discovering the drugs, Rose handcuffed Conley and asked him whether there was anything in the vehicle that Rose should know about. Conley responded that he had "some stuff" in the car. Def.'s Ex. A, R. 58, Page ID #479. Rose then told Conley that he was under arrest and informed him of his *Miranda* rights. Shortly thereafter, law enforcement officers searched the Jeep and found two guns, both of which Conley's girlfriend explained were registered to her. Officers also found additional drugs, cash, and cell phones.

## A. Procedural History

Several months after his arrest, in February 2021, a grand jury indicted Conley on one count of possession of controlled substances with the intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), and (b)(1)(C).

---

[2] While Conley disputes whether he consented to a pat down, he acknowledges in his appellate brief that he said "yes" in response to Rose's question. Pet'r's Br., ECF No. 23, 12.

### 1.   Motion to Suppress

Three months after his indictment, Conley filed a motion to suppress that challenged the validity of the evidence obtained during the stop.  After both parties briefed the motion, the district court held an evidentiary hearing on the matter.  At that hearing, the court heard testimony from Liskey and Rose.  The court also reviewed the dash camera video, as well as documentary and photographic evidence, including the LEIN documents and driver's license records from the Michigan Secretary of State.  Those records corroborated Liskey's testimony that investigators' records indicated that Conley's vehicle was uninsured, and that Conley lacked a valid driver's license at the time of the stop.

After considering that evidence, the district court denied Conley's motion to suppress.  In denying the motion, the court held that:  (1) officers had probable cause to stop Conley based upon the LEIN information that the Jeep lacked insurance and the information that Conley lacked a valid driver's license; (2) Conley consented to the pat down; (3) Rose saw the digital scale in the driver's side door when Conley exited the vehicle; (4) based upon his years of experience and seeing the scale, Rose had reasonable suspicion that the bag contained drugs; and (5) having found the methamphetamine lawfully, Rose was permitted to arrest Conley and search the Jeep.  In ruling on the motion, the district court did not consider Conley's statement that there was "stuff in" the Jeep, which Conley made before he was read his *Miranda* rights.

### 2.   Guilty Plea and Sentencing

Following the denial of his motion to suppress, Conley pleaded guilty to the one-count indictment, pursuant to the terms of a conditional plea agreement.  The plea agreement preserved Conley's right to challenge the district court's denial of his motion to suppress.

Before sentencing, the probation department prepared its Final Presentence Report (the "Final PSR"). Based upon the discovery of the two firearms in the car, the probation department included a two-point enhancement for possession of a dangerous weapon. *See* U.S.S.G. § 2D1.1(b)(1). The Final PSR recommended the enhancement based in part on the fact that there were two firearms found in the car "within easy reach of the defendant." The report also cited Conley's knowledge that his girlfriend often carried firearms, and the fact that Conley had previously possessed the guns while moving them out of the reach of the children. Perhaps most importantly, the probation department relied upon the fact that after being read his *Miranda* rights, Conley told officers where in the car they could locate one of the weapons, which indicated that he knew that at least one gun was in the car. Based on a total offense level of 29 and a criminal history category of II, the Guidelines imprisonment range was 97 to 121 months. However, the statutorily required minimum sentence of 10 years was greater than the lower end of the applicable Guidelines range; therefore, the Guidelines term of imprisonment was 120 to 121 months under U.S.S.G. § 5G1.1(b). Conley objected to the two-level enhancement. In making his objection, Conley argued that he "did not possess" the firearms in the vehicle, and that it was "clearly improbable" that the firearms were connected to the offense. Def.'s Sentencing Mem., R. 49, Page ID ##269–73. Despite that objection, Conley's counsel acknowledged that Conley "was aware that there was a gun in the car at the time" of the stop. Sentencing Hr'g Tr., R. 57, Page ID #463.

The district court conducted a sentencing hearing in November 2021. At that hearing, the government contended that Conley "was in constructive possession of the firearms . . . ." *Id.* at Page ID #465. To support that contention, the government highlighted that the guns were in a car registered to Conley and within his wingspan. The government also averred that it was not "clearly improbable" that the guns were connected to Conley's drug trafficking offense, noting that the

handguns were of the type that are routinely seen in drug cases, that guns are "frequently cited as tools of the drug trade," and that the guns were near the drugs at issue. *Id.* at Page ID #466.

The district court overruled Conley's objection. In doing so, it held that whether Conley possessed the gun was not "factually close" and that "the government [] established, at the very least, constructive possession of the weapon." *Id.* at Page ID ##466–67. Accordingly, the court sentenced Conley to 120 months in custody, which was the mandatory minimum applicable to the offense. Conley's timely appeal followed.

## II. DISCUSSION

### A. Motion to Suppress

#### 1. Standard of Review

"This court reviews a district court's decision on a motion to suppress under two standards. Findings of fact are upheld unless clearly erroneous, while conclusions of law are reviewed *de novo*." *United States v. Master*, 614 F.3d 236, 238 (6th Cir. 2010) (quotations omitted). When conducting such a review, the Court "views the evidence in the light most likely to support the district court's decision." *Id.* (quoting *United States v. McPhearson*, 469 F.3d 518, 523 (6th Cir. 2006)). "A factual finding is clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (quoting *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008)). Thus, a "denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *United States v. Moorehead*, 912 F.3d 963, 966 (6th Cir. 2019) (quoting *United States v. Pasquarille*, 20 F.3d 682, 685 (6th Cir. 1994)).

## 2. Analysis

Conley contends that: (1) the traffic stop was unlawful; (2) Rose lacked reasonable suspicion to prolong Conley's detention after Conley produced proof of insurance; (3) Rose lacked reasonable suspicion to conduct a pat down of Conley; (4) Rose exceeded the scope of his pat down and lacked probable cause to search Conley for drugs; and (5) the statement that Conley made after he was arrested but before he was read his *Miranda* rights was inadmissible. For those reasons, Conley asserts that the district court erred when it denied his motion to suppress.

### a. The Traffic Stop

To make a traffic stop, "an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012) (citing *Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 771 n.6 (6th Cir. 2004)). "Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *Blair*, 524 F.3d at 748 (citations omitted). This Court enforces the prohibition of unlawful stops primarily "through the exclusionary rule, which requires the suppression of any evidence seized during a vehicle search premised on an illegal traffic stop." *Lyons*, 687 F.3d at 763 (citations omitted).

"[A] pretextual stop occurs when the police use a legal justification to make a stop . . . in order to search a person or his vehicle, or interrogate him, for an unrelated and more serious crime for which they do not have the reasonable suspicion necessary to support a stop." *United States v. Huguenin*, 154 F.3d 547, 559 n.10 (6th Cir. 1998) (alterations in original) (quotation omitted). Police officers may make pretextual stops "for any infraction, no matter how slight . . . ." *Blair*, 524 F.3d at 748 (quoting *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995)).

In denying Conley's motion to suppress, the district court determined that officers had probable cause to stop Conley based upon the information from the LEIN that the Jeep lacked insurance and that Conley lacked a valid driver's license. Conley disputes that finding and contends that officers lacked probable cause because officers possessed inaccurate information. The government, however, points to several district court cases from within this Circuit that stand for the proposition that "[p]olice officers are allowed to rely upon information in LEIN to conduct an arrest, even if it later turns out the information in LEIN was inaccurate." *United States v. Lawrence*, 425 F. Supp. 3d 828, 833 (E.D. Mich. 2019) (citing cases). Conley cites no authority to the contrary, nor does he provide evidence that officers possessed inaccurate information with respect to his driver's license.

The government is correct. While it appears that this Court has not held explicitly that LEIN information is enough to establish probable cause, such a proposition is a natural extension of this Court's holding that a digital "license check" can establish probable cause to execute a traffic stop. *United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004). After all, both situations involve officers reasonably relying on information found within a law enforcement database. Moreover, such a holding is consistent with opinions from Michigan state courts and federal district courts within this Circuit, which the Court finds persuasive. *See, e.g.*, *Scott v. City of Port Huron*, No. 15-11773, 2017 WL 877317, at *8 (E.D. Mich. March 6, 2017) ("Arguably, if all that Peczeniuk had relied on was the LEIN, he could have reasonably believed that there was probable cause to arrest Scott."); *Taggart v. Macomb Cnty.*, 587 F. Supp. 1080, 1081 (E.D. Mich. 1982) ("[A] LEIN check is an authoritative source upon which law enforcement officers may justifiably rely in making an arrest."); *Shumate v. Cleveland*, No. 09-11545, 2010 WL 2813334,

at *4 (E.D. Mich. July 14, 2010); *People v. Mazzie*, 926 N.W.2d 359, 368–69 (Mich. Ct. App. 2018).

With respect to Conley's driver's license, Conley's argument is even weaker. As mentioned above, a digital "license check" can establish probable cause to execute a traffic stop. *Sandridge*, 385 F.3d at 1036. Conley cites no authority contrary to that proposition. The stop was lawful

### b. *Prolonged Detention*

When an officer conducts a lawful stop, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (citations omitted). At the same time, that "officer's mission includes 'ordinary inquiries incident to [the traffic] stop.'" *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (alteration in original) (quoting *Illinois v. Caballes*, 543 U.S. 405, 408 (2005)). Such inquiries typically include "checking the driver's license" and "inspecting the automobile's . . . proof of insurance." *Id.* (citation omitted). Thus, by asking for Conley's license, Rose acted within the scope of his lawful "mission." *Id.*

Conley argues that Rose should have ended the stop once Conley produced proof of insurance. That argument fails. Rose testified that he prolonged Conley's detention because Conley did not produce a valid driver's license. The district court credited Rose's testimony on that matter, and Conley provides no evidence to leave this Court "with the definite and firm conviction that a mistake has been committed." *Master*, 614 F.3d at 238 (quotation omitted). Because traffic stops may continue for as long as "is necessary to effectuate the purpose of the stop" (but no longer than is necessary), and because one of the stop's purposes was to investigate

whether Conley lacked a driver's license, the prolonged detention was lawful. *Royer*, 460 U.S at 500.

The next issue is whether Rose lawfully asked Conley to step out of the vehicle. That issue is settled by clearly established law. This Court has observed that during "the course of a stop premised on a traffic violation, police may instruct the driver or occupant to exit the vehicle." *United States v. Street*, 614 F.3d 228, 232 (6th Cir. 2010) (citing *Pennsylvania v. Mimms*, 434 U.S. 106, 111 (1977)). Rose's decision to ask Conley to exit the vehicle was particularly reasonable given his testimony that he was concerned because he "had been aware that there was a potential for a firearm in the vehicle." Hr'g Tr., R. 55, Page ID #359. Thus, Rose did not act unlawfully in prolonging Conley's detention.

### c.  Pat Down

An officer may conduct a pat down when a person provides consent, or "[w]hen an officer is justified in believing that the individual . . . is armed and presently dangerous . . . ." *Terry v. Ohio*, 392 U.S. 1, 24 (1968). In this case, Rose's pat down was justified because: (1) Conley consented to the pat down; and (2) Rose had reasonable suspicion that Conley may have been armed and dangerous.

### i.  Consent

Conley argues that he did not consent to a pat down. "It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search." *United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004) (citing *Davis v. United States*, 328 U.S. 582, 593–94 (1946)). "[C]onsent has effect only if it is given freely and voluntarily." *Id.* (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). A person may provide consent through "words, gesture, or conduct." *Id.* (quotation omitted). "When seeking to justify a search based on consent, the government has the

burden of showing by a preponderance of the evidence that the consent was 'freely and voluntarily given,' and was not the result of coercion, duress, or submission to a claim of authority." *United States v. Bueno*, 21 F.3d 120, 126 (6th Cir. 1994) (quoting *Bumper*, 391 U.S. at 548)). "Whether consent was free and voluntary so as to waive the warrant requirement of the Fourth Amendment is 'a question of fact to be determined from the totality of all the circumstances.'" *Carter*, 378 F.3d at 587 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). Thus, the Court reviews whether consent to a search was freely given "for clear error." *Id.* (citing *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc)).

The district court found that when Conley put "his hands up in the air," he did so "in a fashion indicating that he [was] consenting to the pat down." Hr'g Tr., R. 55, Page ID #430. For that reason alone, it seems, the district court concluded that Conley consented to the pat down. That finding alone is not clearly erroneous. But it omits the strongest evidence that Conley consented to the pat down: Conley said "yes" when asked whether Rose could check him for weapons. Considering Conley's words and actions, the district court's finding that Conley consented to the pat down was not clearly erroneous, as it does not leave the Court "with the definite and firm conviction that a mistake has been committed." *Master*, 614 F.3d at 238 (quotation omitted); *see also United States v. Drayton*, 536 U.S. 194, 207 (2002) ("Officer Lang did not inform respondents of their right to refuse the search, he did request permission to search, and the totality of the circumstances indicates that their consent was voluntary, so the searches were reasonable.").

### ii. *Reasonable Suspicion*

The pat down would have been lawful even if Conley had not consented. A police officer may "perform a 'patdown' of a driver and any passengers upon reasonable suspicion that they may

be armed and dangerous." *Knowles v. Iowa*, 525 U.S. 113, 118 (1998) (quoting *Terry*, 392 U.S. at 88). Whether an officer has reasonable suspicion that a person may be armed and dangerous is based upon an objective standard: would "a reasonably prudent person in the circumstances would be warranted in believing that his safety or that of others was in danger"? *United States v. Campbell*, 549 F.3d 364, 372 (6th Cir. 2008).

Information from an informant that a person is likely to be armed may be sufficient to establish reasonable suspicion. *See United States v. Howard*, 632 F. App'x 795, 798–800 (6th Cir. 2015). The strength of that information is buttressed when the informant has proven to be reliable in the past. *Id.* at 799–800 (citing *Florida v. J.L.*, 529 U.S. 266 (2000)). In this case, Liskey testified that an informant told investigators that if Conley was in a vehicle, he was likely to be armed. Liskey also testified that the informant had provided law enforcement with information for several years.

In addition to information suggesting that Conley was armed, the district court found that Rose had reason to suspect that Conley was dealing drugs. Rose testified that he saw a digital scale in Conley's door pocket, and that he associated digital scales with drug dealing. The district court credited Rose's testimony. While the dash camera video does not prove that Rose's testimony was truthful, it also does not indicate that he was untruthful. Thus, the district court's finding that Rose saw the digital scale does not leave this Court "with the definite and firm conviction that a mistake has been committed." *Master*, 614 F.3d at 238 (quotation omitted).

"This Court has held many times that guns are 'tools of the trade' in drug transactions." *United States v. Hardin*, 248 F.3d 489, 499 (6th Cir. 2001) (citing cases). Accordingly, the combination of the informant's tip and the evidence that Conley was dealing drugs provided Rose with the reasonable suspicion needed to justify a pat down. A reasonable person in Rose's situation

would have been warranted in believing that Conley may have been armed. *See Campbell*, 549 F.3d at 372.

### iii. Scope of the Pat Down

Conley contends that Rose exceeded the scope of the pat down when he squeezed the items in Conley's pocket. A pat down "is for the limited purpose of ensuring the safety of the officer and others around him" and must therefore "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *United States v. Campbell*, 486 F.3d 949, 955 (6th Cir. 2007) (quoting *Terry*, 392 U.S. at 29).

At the same time, an officer conducting a pat down need not "ignore contraband should any be discovered." *United States v. Pacheco*, 841 F.3d 384, 394 (6th Cir. 2016) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 374 (1993)). "If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified . . . ." *Dickerson*, 508 U.S. at 375–76. To determine "whether an object's incriminatory nature is immediately apparent, the court must 'look to three factors, none of which is necessary but each of which is instructive.'" *Pacheco*, 841 F.3d at 395 (quoting *United States v. Garcia*, 496 F.3d 495, 510 (6th Cir. 2007)). Those factors are:

> (1) a nexus between the seized object and the [suspected criminal activity]; (2) whether the intrinsic nature or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; and (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature.

*Id.* (alteration in original) (quoting *Garcia*, 496 F.3d at 510).

In this case, the district court credited Rose's testimony that he conducted an open-palm search and immediately felt what he suspected to be drugs in Conley's pocket. Based upon the totality of the circumstances, the district court found Rose's actions to be justified. Specifically, the court found that the evidence of drug trafficking, especially the digital scale; the plain feel of what the officer reasonably believed to be drugs on Conley's person; and the information that officers had about Conley's potential involvement in drug trafficking made retrieving the drugs from Conley's pocket lawful. Based upon a consideration of the factors articulated in *Pacheco* and *Garcia*, the district court's holding that Rose acted lawfully when he reached into Conley's pocket to seize the drugs was well-supported. *See Moorehead*, 912 F.3d at 966 (quoting *Pasquarille*, 20 F.3d at 685).

### iv. Fruit of the Poisonous Tree

Conley also argues that "[t]o the extent the government relies on Mr. Conley's statement that he had 'some stuff in the car' for its basis of searching the vehicle, this statement must be suppressed as fruit of the poisonous tree." Pet'r's Br., ECF No. 23, 48–49; *Nardone v. United States*, 308 U.S. 338, 341 (1939). The Court need not consider that argument, since neither the district court nor this Court relied upon that statement to find the search lawful. Because the stop, pat down, and search were all lawful, the district court did not err when it denied Conley's motion to suppress.

## B. Sentencing

### 1. Standard of Review

The Court reviews a district court's interpretation of the sentencing guidelines *de novo*. *United States v. West*, 962 F.3d 183, 187 (6th Cir. 2020) (citing *United States v. Orlando*, 363 F.3d 596, 600 (6th Cir. 2004)). The Court reviews findings of fact for clear error. *Id.* (citation omitted).

Under the clear error standard, "a reviewing court must ask whether on the entire evidence it is left with the definite and firm conviction that a mistake has been committed." *Id.* (quotation omitted).

### 2. Analysis

"U.S.S.G. § 2D1.1(b)(1) authorizes district courts to apply a two-level enhancement to the offense level for a drug-related conviction" if the defendant possessed "a dangerous weapon (including a firearm) . . . ." *Id.* (quoting U.S.S.G. § 2D1.1(b)(1)). District courts should apply the enhancement "if the weapon was present, unless it is *clearly improbable* that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.11(A) (emphasis added). For a district court to apply the enhancement, "the government must establish that (1) the defendant actually or constructively possessed the weapon, and (2) such possession was during the commission of the offense." *West*, 962 F.3d at 187 (quoting *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996)). The government must prove those elements "by a preponderance of the evidence." *Id.* (citing *United States v. McCloud*, 935 F.3d 527, 531 (6th Cir. 2019)).

### a. Possession

Whether Conley possessed the guns is a factual finding that this Court reviews for clear error. *Id.* (citing *United States v. Pryor*, 842 F.3d 441, 452 (6th Cir. 2016)). "Constructive possession exists when a person does not have actual possession but instead *knowingly* has the power and the *intention* at a given time to exercise dominion and control over an object, either directly or through others." *United States v. Bailey*, 553 F.3d 940, 944 (6th Cir. 2009) (quotation omitted). When "the defendant is in nonexclusive possession of premises on which [illicit contraband] [is] found, it cannot be inferred that he knew of the presence of such [contraband] and had control of [it], unless there are other incriminating statements or circumstances tending to buttress such an inference." *Bailey*, 553 F.3d 940, 944 n.3 (6th Cir. 2009) (alterations in original).

If a defendant in such a case "den[ies] any knowledge of a thing found in an area under his control," then "[t]he government then must offer evidence to prove that the defendant (1) knew that the thing was present, and (2) intended to exercise [ ] dominion or control over it." *Id.* at 945 (alterations in original) (quoting *United States v. Jones*, 484 F.3d 783, 788 (5th Cir. 2007)). In this case, Conley acknowledged that he knew that at least one gun was in the car, and it is undisputed that he had access to the guns.

As a matter of fact, the district court found that the government "established, *at the very least*, constructive possession of the weapon." Hr'g Tr., R. 57, Page ID #467 (emphasis added). That finding was not clearly erroneous. First, neither party disputes that Conley possessed the car, albeit non-exclusively, which is where the guns were located. *See Hill*, 79 F.3d at 1485. Second, the guns were within Conley's reach. Third, after Conley was read his *Miranda* rights, he told officers where they could find one of the guns, indicating that he knew that at least one gun was in the car. Fourth, a relatively longstanding informant told officers that Conley frequently sold drugs while armed. Based upon that evidence, the district court's factual finding that Conley possessed the guns does not leave this Court "with the definite and firm conviction that a mistake has been committed." *West*, 962 F.3d at 187 (quotation omitted).

### b. *Possession During the Commission of the Offense*

Once the government establishes that a defendant possessed a dangerous weapon, "a presumption arises that such possession was connected to the offense." *Hill*, 79 F.3d at 1485 (quotation omitted). The burden shifts, therefore, "to the defendant to show that 'it is clearly improbable that the weapon was connected to the offense.'" *Id.* (quoting *United States v. Sanchez*, 928 F.2d 1450, 1460 (6th Cir. 1991)). "[T]he weapon need not be possessed during the commission of the actual offense of conviction." *West*, 962 F.3d at 187 (citing *United States v.*

*Faison*, 339 F.3d 518, 520 (6th Cir. 2003)). Instead, the government need only show that the defendant possessed the dangerous weapon "during relevant conduct." *Id.* (quotation omitted). Relevant conduct includes all acts and omissions "that were part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* at 188 (quotation omitted). "Offenses 'qualify as part of the same course of conduct if they are sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.'" *Id.* (quoting U.S.S.G. § 1B1.3 cmt. n.5(B)(ii)). What constitutes "relevant conduct" is a question of law subject to *de novo* review. *Id.* at 187–88.

Conley has failed "to show that it is clearly improbable that the weapon was connected to the offense." *Hill*, 79 F.3d at 1485 (quotation and citation omitted). First, Conley constructively possessed the guns. Second, the guns were near the drugs and in a car that Conley was driving. Third, Conley knew where at least one gun was. Fourth, a tipster informed investigators that Conley often dealt drugs while armed. It was not, therefore, clearly improbable that the guns were connected to Conley's drug dealing. Accordingly, the district court did not err when it applied a two-level sentencing enhancement.

## III.   CONCLUSION

For the reasons set forth above, this Court **AFFIRMS** the judgment of the district court.